ALFRED JENKINS SHRIVER *v.* CARLIN & FULTON COMPANY.

CARLIN & FULTON COMPANY *v.* ALFRED JENKINS SHRIVER.

[Nos. 41, 42, January Term, 1928.]

*Decided April 5th, 1928.*

The causes were argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Charles C. Wallace* and *Edward H. Hammond,* for Alfred Jenkins Shriver.

*Walter H. Buck,* with whom was *Harry E. Parkhurst* on the brief, for the Carlin & Fulton Company.

OFFUTT, J., delivered the opinion of the Court.

These appeals present two questions: (1) Whether an order, filed by the plaintiff in an action on a construction bond in which a judgment had been entered against the principal and sureties, to enter the judgment "agreed and settled" as to one of the defendants "only", operated as a release of the other defendants; and (2) whether the compensation paid to the officer of a corporation for services rendered to it and expenses incidental thereto, where such services were

not connected with nor a part of his duties as an officer, is "salary," "wages" or "hire" of an "employee" within the meaning of the Code, art. 9, sec. 33. And they arise in this way:

On October 5th, 1917, Alfred Jenkins Shriver, Esq., sued the Roland Park Realty Company, G. Howard White, David M. Fulton, Charles L. Fulton, and Joshua E. Franklin, in the Court of Common Pleas, under the Speedy Judgment Act of Baltimore City, on a construction bond, and on June 20th, 1920, a judgment absolute in his favor for $5,273.75 was entered in that case against all of the defendants. On July 26th, 1920, by his attorneys, he filed in the case the following order: "Please enter this case agreed and settled as to G. Howard White only, upon payment of costs by the said G. Howard White." On June 24th, 1925, an attachment issued on that judgment was laid in the hands of the Carlin & Fulton Company, the effect of which was to bind any assets in its hands belonging to David M. Fulton, properly subject to attachment, because, so far as the record discloses, no other defendant was in any way connected with that company. Upon the laying of the attachment the garnishee appeared, and pleaded *nulla bona*. Issue was joined short on that plea, the case was tried before a jury, and on October 3rd, 1927, judgment absolute was entered for the plaintiff for $135. From that judgment both sides appealed, the plaintiff on the ground that the instructions of the court prevented the jury, in estimating the damages, from considering the compensation payable by the garnishee to Fulton after the attachment was laid, and the defendant on the ground that Fulton had been fully released by the order to which we have referred, and that the judgment should have been for the defendant.

The only material fact witness sworn in the case was Walter G. Heim, president of the Carlin & Fulton Company. He in effect testified that Fulton held fifteen shares of the capital stock of the company and that since the laying of the attachment he had received $135 in dividends on that stock; that Fulton was a director and vice-president of the com-

pany, and was also a salesman and sales manager for it; that, as director and vice-president, he exercised various functions of an administrative character in connection with the corporation, but that for such services he received no compensation. He further testified that, as salesman and sales manager, Fulton received $250 a month as salary and $50 a month for his travelling expenses; that as sales manager he had supervision of all the outside force, in seeing that the orders are gotten out properly, and he is, in other words, general sales manager, and looks after, not only the salesmen, but the clerks in the outside store, and also occasionally sells himself, "goes out"; that his supervision extended to the work of six clerks and nine salesmen employed by the corporation, but that he had no authority to extend credit to a purchaser or to authorize the other salesmen to do so, except in the absence of the president; that the volume of business in 1925 was about $450,000, but not quite so good in 1926; that the compensation paid Fulton was for his services as salesman and sales manager; that the fact that Fulton was a director and vice-president had nothing to do with his being selected as a salesman and sales manager; that the $50 was paid each month, to cover Fulton's travelling expenses, that he did not have to account for his travelling expenses, but he had to take care of them out of that allowance. The plaintiff also offered in evidence an extract from the by-laws of the garnishee relating to the duties of its officers, and proved the docket entries and proceedings in the original case of *Shriver v. White, et al.*

Upon this evidence the garnishee offered two demurrer prayers (Nos. 1 and 2) which were refused, two prayers (3 and 4) limiting the plaintiff's recovery to the dividends paid to Fulton pending the attachment, which were granted, and two (5 and 6) which asked the court to instruct the jury that the order of satisfaction as to White also released the other defendants, which were refused. The plaintiff excepted to the granting of the garnishee's 3rd and 4th prayers, and the garnishee excepted to the refusal of its remaining prayers. In addition to these rulings the garnishee also

excepted to certain rulings on the admissibility of evidence, but these exceptions were not pressed in this court, certainly do not involve any reversible error, and need not be further noticed.

(1) In granting the garnishee's third and fourth prayers the trial court held in effect that the compensation payable to Fulton by the garnishee was exempt from attachment under Code, art. 9, sec. 33, and the question presented by the plaintiff's appeal is whether it erred in that ruling. The statute exempts from attachment the "wages", "hire", or "salary" of "any laborer or employee", and the immediate question is whether the money payable by the garnishee to Fulton as salary or for expenses is the salary or hire of an employee within the meaning of the statute.

With respect to that question appellant contends (1) that Fulton was not an "employee" of the garnishee within the meaning of the statute, and (2) that, even if he was, the allowance to him for expenses was not a part of his salary, wages, or hire.

In referring to that statute, Judge McSherry said in *American Casualty Ins. Co.'s Case*, 82 Md. 567: "The Act of 1854, creating an exemption in favor of a class of persons least able to protect themselves and largely dependent on their wages for support, was given a liberal and not a technically strict construction that might perhaps have been placed upon it." If, as stated in that case, the object of the statute was to protect a class of persons "least able to protect themselves and largely dependent on their wages for support," and it should be liberally construed to accomplish that purpose, then it is obvious that the meaning of the word "employee" is not narrowed or limited by the word "laborer" which accompanies it, but that it is designed to include persons who could not be described as "laborers," as that word used as a generic term is ordinarily understood. In its broadest sense the word "laborer" would include every one who performed any kind of mental or physical labor, but as commonly and customarily used and understood it only applies to one engaged in some form of manual or physical labor (*Oxford Dictionary; Words and*

*Phrases*), although it has been given a broader meaning in some cases referred to in *Words and Phrases* under the title "Laborer." But if the purpose of the statute was to protect such persons as were "largely dependent on their wages for support," then the Legislature must have used the word "employee" to cover such persons in that class as would not be described by the term "laborer," and that construction appears to be reasonable and logical, since the reason for the exemption is the same in both cases, to wit, the fact that the employee whether laborer or not depends largely upon his wages for support, for there is no apparent reason to distinguish between the necessities of one engaged in manual or physical toil and one engaged in a clerical capacity, and to give to one an immunity denied to the other, when both alike are wage earners depending upon their wages for support. And that is the construction given the statute in *Moore v. Heaney*, 14 Md. 562, where this court said: "With reference to the persons entitled to exemption under the laws referred to, can it be a proper construction of those laws, to say, the Legislature intended to include laborers only when the language used is, 'a laborer or other employee'? A laborer, when engaged in service, under contract for compensation, is an employee, but after saying a 'laborer' there is added, 'or other employee'. Surely, in this was meant more than a laborer, or else, why, after using that word, add those which follow? If they only mean persons who are included within the meaning of the word laborer, they are mere tautology and useless," and there it was held that the defendant, who was employed for a consideration of five per cent. of the cost of construction to superintend the erection of a certain building was an employee and that the five per cent. commission was wages. The same view was taken in *Conlee Lumber Co. v. Ripon Lumber Co.,* 66 Wis. 488, where the court said, in referring to a claim for preference in the distribution of the assets of a corporation made by its general manager: "He was an active business man, put his whole time in the business,

took charge of selling lumber and measuring out and piling it, and all that. His being a stockholder and a manager on a salary did not prevent him from being an employee for wages within the meaning of the act. If the words 'servants' or 'employes,' in the clause of the act quoted, mean nothing more nor different than the word 'laborers' therein, then they are extremely tautological, and a useless repetition. It seems to us that the three words were used for the purpose of extending and broadening the exception made in the statute." And the construction given the act in *Moore v. Heaney, supra,* has so far as we know never been departed from in this state. An attempt was made in *Wilmer v. Mann,* 121 Md. 239, to lessen its force by confining the decision in that case to the construction of the statute as it then stood, where the phrase under consideration was "laborer or other employee," the appellant contending that the decision was based upon the use of the word "other" as qualifying "employee," but the court rejected that proposition, and quoting an expression used by Judge McSherry in *American Casualty Ins. Co.'s Case,* said that "this court gave a wide and liberal meaning to the word 'employee', so as to bring as large a class of persons as possible within the provision which created an exemption, in favor of laborers and other employees, from the stringent terms of the attachment law and from the equally harsh effects of an attachment levied by way of execution on wages," and held that a salesman for a piano dealer was an employee within the meaning of the language of that statute, which in that respect is the same as the statute now under consideration. The appellant apparently relies to some extent on such cases as *Lewis v. Fisher,* 80 Md. 139, and *Perkins v. Barr,* 126 Md. 92, but for the reasons pointed out by Judge McSherry in *American Casualty Ins. Co.'s Case, supra,* those cases cannot affect the question in issue here, because they involved the construction of a statute which gave to certain classes of creditors of an insolvent a preference in the distribution of the insolvent estate, and tended to disturb and de-

stroy that equality amongst all the creditors which the statute was intended to promote and preserve. For that reason, in those and similar cases the court felt constrained to give a strict construction to those provisions of the statute creating such preferences, in order to promote and carry out the manifest purpose of the entire statute, but where the purpose of the statute under consideration, as in this case, was to exempt laborers and employees from the "harsh effects of an attachment levied by way of execution on wages," to gratify that purpose, the court gave a "wide and liberal" meaning to the word "employee," so as to bring as large a class as possible within the benefit of the statute. *Moore v. Heaney, supra.* But even when used in statutes giving the claims of "employees, laborers and operatives" a preference in the distribution of an insolvent estate, the word "employee" has been held to include a salesman employed at a salary of $100 a month to sell and set up mowing machines. *Palmer v. Van Santvoord,* 153 N. Y. 612. And in *Re Lawler,* 110 Fed. 136, it was held that, liberally construed, the word "employee" included a traveling salesman for a lumber company, and other cases to the same effect may be found collected in 20 *C. J.* 1241.

In our opinion, therefore, without further laboring the point, Fulton was an employee of the garnishee, unless his status as such was affected by the fact that he was also a stockholder, director and vice-president of the corporation which employed him. It is true that a director nor any other officer of a corporation is by virtue of his office its employee, but there seems to be no valid reason why his occupancy of such office should disqualify him from serving the corporation in some other and different capacity, or from becoming its employee, where the duties and incidents of his employment are separate and distinct from those pertaining to his office. In this case Fulton was employed under a definite contract to render specified services at a stated wage or hire, payable at fixed intervals, and his employment was neither connected with, nor the result of, his tenure of the office of director or vice-president of the corporation, and

in our opinion the fact that he was an officer of the corporation did not prevent him from being at the same time its employee. 14 *A. C. J.* 137; *Waters v. Amer. Finance Co.*, 102 Md. 216; *McGowan v. Finola Mfg. Co.*, 120 Md. 340; *Santa Clara Min. Assn. v. Meredith*, 49 Md. 400.

The second question is whether the allowance of $50 per month for traveling expenses was a part of Fulton's "wages," "salary" or "hire." The three words "wages," "salary" and "hire," although varying perhaps in their scope, nevertheless express one idea common to them all—compensation for personal services of some kind. And when thus used and applied to the facts of this case, it is impossible to escape the conclusion that they include the allowance of fifty dollars per month to Fulton for his traveling expenses. It certainly was not a gift, nor was it made to satisfy any obligation due Fulton by the corporation other than for services rendered by him to it. The nature of his services was such as to require certain expenditures for transportation and subsistence, without which the services could not have been rendered.

If the arrangement had been to pay Fulton $3,600 a year for his services, upon an express agreement that he was to receive nothing in addition to that sum for any expenses incurred in performing those services, it is not easy to see how that allowance could be regarded as anything but compensation for his services. If, instead of paying him $3,600 a year to cover his own labor and the expense incident to the service, it had allowed him a commission, the commission would have been regarded as wages, even though Fulton had been obliged to pay out part of it to cover expenses necessarily incurred in earning the commission. *Moore v. Heaney, supra.* In the case last cited it may reasonably be assumed that Quinlan incurred expenses for transportation to and from the work, clerical assistance, etc., but it was not even suggested that such expenditures were not a part of the wages or hire due him. And so far as this question is concerned, there seems to be no difference between such a case and this, for the purpose of the allowance, salary and ex-

penses in the one case, and commissions in the other, is the same in both, compensation for services rendered. And that view was taken in *Hamberger v. Marcus,* 157 Pa. St. 133, where the court, in considering whether commissions could be regarded as wages within the meaning of a statute exempting the wages of certain classes of persons from attachment, said: "These commissions are as clearly compensation of the employee for personal services in the interest and for the benefit of the employer as the monthly stipend is. It is a narrow construction of the statute which allows the creditors of one employee to attach in the hands of the employer the commissions which constitute his compensation for personal services and exempts from attachment in the hands of the same employer the compensation of another employee for like services." If his traveling expenses would have been a part of the compensation paid Fulton for his services when included in a commission, they would seem to be no less a part of his compensation for the same services when paid in the form of monthly stipends. In our opinion therefore the defendant's first and second prayers were properly refused.

The next question is presented by the defendant's appeal. His contention is that the order entering the case "agreed and settled" as to White released all the other defendants. If the entry of "agreed and settled" can be regarded as equivalent to "settled and satisfied," and if its legal effect was not limited by the use of the word "only," in the order to enter it agreed and settled as to White "only," there can be no doubt that it did operate as a release of all the defendants. It was held in *Booth v. Campbell,* 15 Md. 569, that a release of a judgment as to one of several joint defendants operated as a release of all, and in *Smith v. State, use of County Commrs.,* 46 Md. 617, it was said that a "release of one or more sureties without the assent of the co-sureties will operate at law to discharge the latter." It is true that in that case the court held that the release under consideration there did not have that effect, but that was because the court was sitting in the exercise of a *quasi* equitable jurisdiction and applied the equitable rule, which is different. But

in this case the court sits as a court of law, and there is no question of equitable jurisdiction.

In *Tabler v. Castle,* 22 Md. 94, it was decided that the word "settled" in such an order was equivalent to "satisfaction," or an exhaustion of the right of action on that obligation, so that there is no doubt that the order was intended to finally discharge White from any liability under that judgment. It is also apparent that by the use of the word "only" the plaintiff attempted at least to confine the effect of the order to White, and to retain the judgment against the other defendants. The effect of such a limitation has never been passed upon by this court, and, although it has frequently been considered elsewhere, the cases dealing with the question are in sharp conflict. But Freeman in his work on *Judgments,* sec. 1141, states that the prevailing rule is that a release of one joint judgment debtor does not release his codefendants, if the release "shows that it was not intended to discharge other debtors except to the extent of the payment made, if any, by the one released." The exception appears to have grown out of an effort to escape the harshness of the common law rule, that a release of one obligor in a bond or one joint tort-feasor operated to discharge all other jointly bound with him. And the device adopted to accomplish that end was the fiction of a covenant not to sue. That is, conceding that a technical release of one joint obligor would release his co-obligors, the courts said, in cases where the deed of release contained a proviso that the obligee reserved the right to proceed to collect the balance due him on the bond from the other obligors, that it was not a technical release but a covenant not to sue, and as such could be given the effect, either at law or in equity, not to release the entire judgment but only to exonerate the debtor to whom the release was given from liability to the releasing creditor, but to leave him subject to all rights of contribution or subrogation which his co-obligors might have against him. In England, after some hesitation and uncertainty, that rule seems to be firmly established. In *Thompson v. Lack,* 3 C. B. 540, it appeared that John Lack under an indenture

granted an annuity to one Springall, his executors, adminis-
trators and assigns during the lifetime of the said Lack,
and that C. P. Lack and E. J. Lack joined in the execution
of the deed as sureties. After Springall's death, but during
the life of John Lack, Springall's executors sued E. J. Lack
for arrearages due under the annuity. The defence was
that Springall had executed an indenture under which he
released C. P. Lack from any further payments under the
deed from John Lack, but expressly reserved the right to
enforce his rights thereunder against John Lack and E. J.
Lack. Wilde, C. J., in that case did not call the deed a
covenant not to sue, but he gave it the same effect as such a
covenant. And in that connection he said, "What is the
effect of the deed which is therein described as a release?
Are you at liberty to separate that which professes to be a
release from the proviso? Or must you take them both to-
gether, and say what is their entire effect? It seems to me,
that you must look at the whole of the deed; and that raises
the point, whether a party may give a qualified release. *Solly
v. Forbes* is a decision that you may give such a release;
and, although in *Nicholson v. Revill* there are to be found
expressions used by Lord Denman, in delivering the judg-
ment of the court, inconsistent with that view, it seems to
me that those expressions are more of the nature of *obiter
dicta* than those attributed to Lord Eldon in *Ex parte Gif-
ford*. In the latter case, Lord Eldon decided, in conformity
with the principle established by *Solly v. Forbes*—which I
consider is a decisive authority—that a release may be quali-
fied, and prevented operating as a discharge of a co-surety.
The question here is, whether the release in this deed is
qualified, and reserves the remedy against the defendant.
It is admitted that the intention of the parties is clear; and
strong grounds should be laid before the court to induce it
not to give effect to the deed according to such intention."
In *Price v. Barker,* 4 El. & Bl. 760, Brown and Hopps exe-
cuted a joint and several bond guaranteeing the payment
of certain commercial paper. The obligee executed a deed
poll releasing Brown from all suits, claims or demands which

it might have against him, but reserving its rights against
Hopps, his co-obligor. In construing that document Cole-
ridge, J., said: "With regard to the first question, two modes
of construction are for consideration. One, that, according
to the earlier authorities, the primary intention of releasing
the debt is to be carried out, and the subsequent provision
for reserving remedies against co-obligors and co-contrac-
tors should be rejected as inconsistent with the intention to
release and destroy the debt evinced by the general words
of the release, and as something which the law will not
allow, as being repugnant to such release and extinguishment
of the debt. The other, that, according to the modern authori-
ties, we are to mould and limit the general words of the re-
lease by construing it to be a covenant not to sue, and thereby
allow the parties to carry out the whole of their intentions
by preserving the rights against parties jointly liable. We
quite agree with the doctrine laid down by Lord Denman,
in *Nicholson v. Revill,* 4 A. & E. 675, as explained by Baron
Parke in *Kearsley v. Cole,* 16 M. & W. 136, that, if the deed
is taken to operate as a release, the right against a party
jointly liable cannot be preserved; and we think that we
are bound by modern authorities (see *Solly v. Forbes,* 2 Br.
& B. 38; *Thompson v. Lack,* 3 Com. B. 540, and *Paylar v.
Homersham,* 4 M. & S. 423) to carry out the whole inten-
tion of the parties as far as possible, by holding the present
to be a covenant not to sue, and not a release." In *Duck v.
Mayheu* (1892), 2 Q. B. 511, in construing a paper dis-
charging one joint tort feasor, without prejudice to the plain-
tiff's claim against the other joint tort feasor, it was held to
be a covenant not to sue.

While many of the earlier cases in this country enforced
the strict common law rule, the tendency of later decisions
is the other way, although there are exceptions. In 23
R. C. L. 404 it is said: "Although many early cases may be
cited to the effect that the rule applied by courts of law was
otherwise, and that a saving clause repugnant to the nature
of the grant was void, and that the grant remained absolute
and unqualified, such is not the modern rule of construction.

The equitable rule now prevails, and a release is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation. Hence the legal operation of a release of one of two or more joint debtors may be restrained by an express provision in the instrument that it shall not operate as to the other."

While it is not necessary in this case to go to the extent of holding that a release under seal of one joint obligor named in a bond is in legal effect only a covenant not to sue, where the release contains a proviso that it is not to affect the obligee's right to sue the other obligors, yet it can be held, consistently with the great weight of modern authority, that where the paper relied upon as a release is not under seal and contains such a proviso, it will be given effect as a covenant not to sue, rather than as a complete satisfaction or as a release. And that view is very clearly expressed in a note in 58 L. R. A. 307, where it is said: "But in releases not under seal the courts are coming to a more reasonable and equitable doctrine, allowing the intentions of the parties to the agreement to regulate the extent to which it shall be given effect, and attempting to treat it the same as any other unsealed contract between the parties, not unlawful in itself and plain and express in its terms."

In this case the judgment was on a sealed instrument and could not have been technically released except by a sealed instrument, for, while an entry of satisfaction given for adequate consideration would no doubt estop the judgment creditor from proceeding further, nevertheless in the absence of a seal it would not be a technical release at common law (*Freeman on Judgments,* par. 1140; *Whitehill v. Wilson,* 3 Pen. & W. (Pa.) 405; *Davis v. Bowker,* 1 Nev. 487, 15 R. C. L. 828), and in our opinion the order of satisfaction as to White was not a release, but a covenant not to sue, for there is no reason, as was suggested by the court in *Barnet v. Conklin,* 266 Fed. 183, for adding, to the harsh rule of the common law, a harsh construction of the order of satisfaction. The manifest intention of the plaintiff was to

release only White, but to retain the judgment against the other defendants, and there is no reason why that intent should not be given effect. It could not possibly have prejudiced White's co-defendants. In enforcing his judgment the plaintiff was not obliged to proceed against them jointly, but he could have collected it from any one or from all of them as he saw fit, but he could do nothing without their consent which would affect their rights *inter sese,* and, if as a result of the order White's co-defendants suffered any loss, or the amount which they might be required to pay to satisfy the judgment was increased, to that extent the plaintiff's rights against them would be extinguished. Moreover, if White paid less than his share of the judgment, and his co-defendants paid the balance due, they could, notwithstanding the order of satisfaction as to White, compel him to contribute whatever was necessary to make up the part which he should have paid, and if he paid more than his share, certainly his co-defendants were not injured, because it decreased not only their joint but their several liability.

For these reasons, therefore, in our opinion, the order of satisfaction did not operate as a discharge of the judgment against the appellant in this case, and the defendant's fifth and sixth prayers were properly refused, and it follows that the judgment appealed from will be affirmed.

> *Judgment affirmed, with costs to the appellee in each appeal.*